IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**DORA L. BONNER**,
    Plaintiff,

v.

**TRIPLE-S MANAGEMENT CORPORATION** and **TRIPLE-S VIDA INC.**,
    Defendants.

Civil No. 19-1228 (BJM)

## OPINION & ORDER

Dora L. Bonner ("Bonner") brought this action against insurance companies Triple-S Management Corporation ("TSM") and Triple-S Vida Inc. ("TSV") (collectively "Triple-S"), alleging that Triple-S committed fraud, breach of contract, and breach of fiduciary duty under Texas state law, and civil violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 *et seq*. Docket Nos. ("Dkts.") 5, 17. Triple-S has moved for summary judgment, Dkt. 55, supplementing the motion with a statement of purportedly uncontested facts. Dkt. 54. Bonner has opposed the motion, Dkt. 69, and submitted a memorandum in opposition to Triple-S's statement of uncontested facts. Dkt. 70. Triple-S has also submitted a reply in response to Bonner's opposition. Dkt. 76. This case is before me by consent of the parties. Dkts. 39, 40, 44. For the reasons set forth below, Triple-S's motion for summary judgment is **GRANTED**.

### APPLICABLE LEGAL STANDARDS

Summary judgment is appropriate when the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. § 56(a). A dispute is "genuine" only if it "is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*,

*Dora L. Bonner v. Triple-S Management Corporation and Triple-S Vida Inc.,* Civil No. 19-1228 (BJM)    2

477 U.S. 242, 248 (1986). The moving party has the initial burden of "informing the district court of the basis for its motion, and identifying those portions" of the record "which it believes demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may meet its burden by either producing evidence disproving an element of the nonmoving party's case or by pointing out that there is an absence of evidence to support the nonmoving party's case. *See id*. at 325. Once the moving party shows the absence of any disputed material fact, the burden shifts to the non-moving party to place at least one material fact into dispute. *Burgos Martinez v. City of Worcester*, 502 F. Supp. 3d 606, 614 (D. Mass. 2020).

The court does not act as trier of fact when reviewing the parties' submissions and so cannot "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon" conflicting evidence. *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). Rather, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). And the court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute," Local Rule 56 requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by citations to the record, which the movant contends are uncontested and material. *CMI Capital Market Inv. v. Gonzalez-Toro*, 520 F.3d 58, 62 (1st Cir. 2008); D.P.R. L. Civ. R. 56(b), (e). The opposing party must admit, deny, or qualify those facts,

with record support, paragraph by paragraph. D.P.R. L. Civ. R. 56 (c), (e). The opposing party may also present, in a separate section, additional facts, set forth in separate numbered paragraphs. *Id.* 56(c). While the "district court may forgive a party's violation of a local rule," litigants ignore the local rule "at their peril." *Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir. 2007).

Bonner raises fraud, breach of contract, breach of fiduciary duty, and RICO claims, arguing that Texas state law applies to her claims. In order to successfully bring a fraud claim under Texas state law, a plaintiff must show that "(1) [the defendant] made a material representation that was false; (2) it knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) it intended to induce [the plaintiff] to act upon the representation; and (4) [the plaintiff] actually and justifiably relied upon the representation and thereby suffered injury." *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001). "The elements of a breach of contract claim are: (1) a valid contract; (2) performance or tendered performance; (3) breach of the contract; and (4) damages resulting from the breach." *Myan Mgmt. Grp., L.L.C. v. Adam Sparks Fam. Revocable Tr.*, 292 S.W.3d 750, 754 (Tex. App. 2009). "Generally, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017). A RICO violation "requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (footnote omitted).

## FACTUAL FINDINGS

The following facts are taken from Triple-S's "Statement of Uncontested Facts," Dkt. 54, and accompanying exhibits and affidavits submitted by Triple-S; Bonner's amended complaint,

Case 3:19-cv-01228-BJM   Document 77   Filed 12/17/21   Page 4 of 14

*Dora L. Bonner v. Triple-S Management Corporation and Triple-S Vida Inc.,* Civil No. 19-1228 (BJM)    4

Dkt. 17, and accompanying exhibits; and Bonner's memorandum in opposition to Triple-S's Statement of Uncontested Facts, Dkt. 70, and accompanying exhibits at Dkt. 69. I have disregarded statements of fact, denials, and qualifications that were not supported by a record citation. *See Davila v. Potter*, 550 F.Supp.2d 234, 239 (D.P.R. 2007). Where parties' record citation does not support or exaggerates the corresponding statement of fact, I have disregarded it. I have also disregarded legal conclusions presented as statements of fact.

Bonner purports to contest nearly all of the supposed facts that Triple-S claims are supported by the affidavits, but in practice Bonner almost exclusively contests the facts via references to phone and email conversations she had with individuals claiming to be Triple-S employees or associates. All of the conversations cited by Bonner are fully consistent with the facts and case theory put forth by Triple-S and do not actually serve to contest the facts alleged by Triple-S. However, in certain instances Bonner does correctly point out that some of the purported facts advanced by Triple-S are presented in a wholly conclusory matter or are not fully supported by the evidence on hand. Those supposed "facts" have been excised from the following summary. I have also made reference to allegations raised by Bonner in her amended complaint while generally drawing all reasonable inferences in her favor.

TSM is an independent licensee of the Blue Cross Blue Shield Association and a holding company for several insurance companies that offer health, life, and property casualty insurance in Puerto Rico, including TSV, a company that offers life insurance. Dkt. 54-1 at ¶ 2. Neither TSM nor its subsidiaries invest assets on behalf of individuals. *Id.* at ¶ 3; Dkt. 54-6 at 8. TSV does assist individuals with making deposits into an individual retirement account for retirement purposes. Dkt. 54-1 at ¶ 3. However, TSV does not offer other investment services to individuals seeking financial guidance, such as investments of millions of dollars. *Id.* Management of growth funds

and individual investments is outside the scope of Triple-S's business practices, and TSM does not have a "Triple-S Growth Fund." *Id.* at ¶¶ 9, 11.

In 2013, TSV acquired Atlantic Southern Insurance Company ("ASI"). *Id.* at ¶ 4. ASI sells life and cancer insurance to individuals as well as individual and group health insurance. *Id.* Like TSM and its subsidiaries, Atlantic Southern does not offer investment and financial services to individuals seeking to invest large sums of money. *Id.* TSV is the direct parent company for ASI. *Id.* ASI has an office in Costa Rica, but it does not have a Nicaragua location. *Id.*

The issues before the court first arose in March 2015, when Bonner was contacted by an individual claiming to be associated with Triple-S. During a conversation on March 11, 2015 between Bonner and a person identifying himself as Albert Gamboa Spencer ("Gamboa"), Gamboa said that he was employed by TSV as a lawyer and that TSV had purchased the company he formerly worked for, ASI. Dkt. 17 at ¶ 7, 14. Bonner claims to have previously sent money to ASI. *Id.* at ¶ 11. Gamboa claimed that he had called Bonner because someone had attempted to change the beneficiary on a certificate held by TSV with Bonner's personal identification attached to it. *Id.* at ¶ 8. Gamboa told Bonner the account number and the amount of the certificate. *Id.* He also told her that the money was being held in Costa Rica. *Id.* Gamboa then told Bonner that he was aware that she had already sent money to ASI and that he would work with her to try to release her funds. *Id.* at ¶¶ 11, 23. Bonner was eventually told that she actually had two certificates in her name and not just one. *Id.* at ¶ 15. The funds were allegedly in TSM's "Triple-S Growth Fund." Dkt. 17-1.

In 2015, Carmen M. Ayala-León ("Ayala") was employed by TSV as the Executive Assistant to the Vice President of Legal Affairs. Dkt. 54-7 at ¶ 1. On March 10, 2015, Ayala received an email from Bonner, inquiring about a transaction that, according to Bonner, had been

"initiated out of ASI-Nicaragua." *Id.* at ¶ 2. Ayala replied to the email that same day, telling Bonner that the company would investigate her request and then contact her. *Id.* On March 24, 2015, Ayala attempted to respond to Bonner and inform her that the company was not able to find anything in its systems related to the information she had provided. *Id.* at ¶ 3. However, Bonner alleges that Ayala responded to the wrong email address. Dkt. 70 at 23. Ayala did not receive any further communications from Bonner. Dkt. 54-7 at ¶ 4.

From March 11, 2015 until sometime in August 2015, Bonner engaged in phone calls and emails with individuals claiming to be associated with Triple-S and stating they were working in Costa Rica, Nicaragua and Puerto Rico. Dkt. 17 at ¶ 13. These individuals included a person identifying himself as Feliciano Zelaya ("Zelaya"), purportedly the Financial Manager and Vice President of Finance for TSM; a person claiming to be Eugenio Cerra, Jr. ("Cerra"), the supposed "chairman" for TSM; a person claiming to be Emilio Aponte ("Aponte"), allegedly a board member for TSM; and a person saying he was Ramon Ruiz, the Chief Executive Officer of TSM. *Id.* at ¶¶ 15, 17-20, 98. In all, Bonner participated in over 70 phone calls and over 150 emails between her and these individuals. *Id.* at ¶¶ 20-21.

In April 2015, Zelaya told Bonner that she would need to pay a "management fee" in order to release the certificates. *Id.* at ¶ 30. To satisfy this payment, Bonner was told to transfer $65,438.50 to a Maria Elena Ramos de Chang by wire, which Bonner did on April 20, 2015. *Id.* at ¶¶ 32-33. On April 21, 2015, Bonner was told that she would receive one of the certificates at her local bank within the hour, but she did not. *Id.* at ¶ 35. Zelaya subsequently told Bonner that there was an issue with a form and that she would have to pay an additional management fee in order to cash out and release the certificates. *Id.* at ¶ 37. This time Zelaya told Bonner that she would need to pay $68,710.43. *Id.* at ¶ 38. However, on May 6, 2015, Cerra and the individual claiming to be

Ruiz contacted Bonner and told her that the certificates had been blocked from being deposited with her bank yet again; they also told her that she would need to pay yet another management fee. *Id.* at ¶ 42. Cerra and Zelaya then offered Bonner the chance to purchase a third certificate for $134,000.00, supposedly as a form of reinvestment to recoup the lost management fees. *Id.* at ¶ 43.

Cerra and Zelaya subsequently contacted Bonner again and discussed potential options for her to regain her lost money. *Id.* at ¶ 44. Zelaya eventually claimed that they were running out of options unless Bonner paid them a fee yet again; Bonner replied that this was not an option for her. *Id.* Zelaya subsequently called again and claimed that if Bonner did not pay, she could lose her funds to the FBI; he told her that she needed to come up with at least $50,000.00. *Id.* at ¶ 45. Bonner replied that the most she could pay was $10,000.00. *Id.* The individual claiming to be Ruiz then called, saying that he would attempt to transfer the certificates again; he also said that the FBI was requesting that the certificates be turned over to them, but that the FBI had not provided him with a subpoena yet and that he had refused as a result. *Id.* at ¶¶ 46-47. Soon afterwards, Cerra and the person claiming to be Ruiz then called saying that the money had been sent back to TSM and asking yet again for more money with which to pay management fees. *Id.* at ¶ 48.

On July 1, 2015, Bonner received a call from Aponte, who said that he had been instructed to help get the money out of TSM and to Bonner. *Id.* at ¶ 50. Aponte claimed that the strategy he would use to do so cost $13,000.00, a fee that would allow him to prepare the necessary documents. *Id.* at ¶ 51. Bonner began to pay the $13,000.00 in installments, while Aponte called her back at regular intervals to update her on his supposed progress and ask her for the balance of the $13,000.00. *Id.* at ¶¶ 52-58. Bonner eventually paid the full balance of the $13,000.00. *Id.* at ¶¶

*Dora L. Bonner v. Triple-S Management Corporation and Triple-S Vida Inc.,* Civil No. 19-1228 (BJM)        8

53-54, 80. In all, Bonner claims to have paid out over $1,000,000.00 in supposed "management fees."[1] *Id.* at ¶ 81. However, nothing was ever transferred to her in return.

Employment records from TSM, TSM's subsidiaries, and ASI do not indicate that individuals identifying as Eugenio Cerra, Jr., Feliciano Zelaya, Albert G. Spencer, Ms. Ramos de Chang, or Emilio Aponte have ever worked for TSM, TSV, ASI, or any of their subsidiaries. Dkt. 54-5 at ¶ 2. As of April 2015, the Vice President of Finance and CFO for TSM was Amílcar L. Jordán-Pérez, not Zelaya. Dkt. 54-1 at ¶ 6. In May 2015, TSM's Chairmen of the Board was Luis A. Clavell-Rodriguez, M.D., not Cerra. TSM uses titles such as "General Counsel," "Acting General Counsel," "Associate General Counsel," and "Attorney" for its in-house attorney positions. Dkt. 54-5 at ¶ 3. As such, there is no such position as "Head of Legal, Country Director" at TSM, TSV, ASI, or any Triple-S companies or subsidiaries, despite Gamboa identifying himself to Bonner as the "Head of Legal Department, Country Director." *Id.*; Dkt. 17 at ¶ 89.

A Ramon M. Ruiz-Comas ("Ruiz") did serve as President and Chief Executive Officer of TSM from May 2002 to December 31, 2015. Dkt. 54-6 at ¶ 2. However, Ruiz has stated under oath that he has never met or spoken, either by telephone or in person, with Bonner. *Id.* at ¶ 3. Ruiz also swears that the email address shown in the interactions between Bonner and the individual claiming to be Ramon Ruiz, "r.ruiz@asi-sss.net," was not his email address at that time. *Id.* at ¶ 6. He avers that he has never emailed Bonner, corresponded with her in any way, read any letters or documents from her, written her any letters, or sent her any documents. *Id.* at ¶ 3. He also claims that he has never instructed anyone else to prepare documents for Bonner or attempted to make any transfers on Bonner's behalf. *Id.* at ¶¶ 3, 7. In fact, Ruiz says that he had never heard of Bonner

---

[1] It is unclear how Bonner arrived at this sum. I suspect that she is actually claiming that she spent over $100,000.00 in supposed management fees, not $1,000,000.00, but her amended complaint does not clearly explain precisely how much money she ultimately sent to the individuals that she was in contact with.

until Bonner first filed suit against TSM. *Id.* at ¶ 3. Ruiz also specifically swears that he has never met, spoken to, or communicated with anyone named Feliciano Zelaya, and that he did not instruct Feliciano Zelaya or anyone else to prepare a certificate of investment for Bonner. *Id.* at ¶ 5. Ruiz claims that his purported signature in the evidence provided by Bonner is not actually in his handwriting. *Id.* at ¶ 4. He also states that it is his habit and practice when signing his name to sign his full last name, "Ruiz-Comas," and not just "Ruiz." *Id.*

TSM does not bank with Bank of America, does not have a corporate account there, and does not have a corporate credit card with Bank of America. Dkt. 54-1 at ¶ 12; Dkt. 54-6 at ¶ 8. TSM does not bank with Wells Fargo either. Dkt. 54-1 at ¶ 17. TSM has no record of the Wells Fargo account number 3173354402 or routing number 121-000-248. *Id.* TSM has no record of ever producing a certificate for over $8 million to a Dora Bonner. *Id.* at ¶ 15. TSM also has no record of holding any certificates labeled "2M1505135" or "TSM-89563 Dora Bonner." *Id.*

Regarding the phone number and address shown on the wire transfer documents purportedly given to Bonner by TSM, *see* Dkt. 17-1, the phone number is not a valid TSM company phone number, and TSM is located in San Juan, not Guaynabo. *Id.* at ¶ 12; Dkt. 54-6 at ¶ 8. Furthermore, there is no such address as "1441 Franklin Delano Roosevelt" in Guaynabo despite the documents provided by Bonner listing that address. Dkt. 54-1 at ¶ 12. It is also TSM's usual business practice to require two signature authorizations for wire transfers despite the attempted wire transfers to Bonner not including two such signatures. *Id.* at ¶ 13; Dkt. 17-1; Dkt. 54-6 at ¶ 8.

The individuals who emailed Bonner used the email domain "asi-sss.net." *See* Dkt. 17-1. The domain "asi-sss.net" was not a domain used by TSM and its subsidiaries in 2015. Dkt. 54-1 at ¶ 7; Dkt. 54-6 at ¶ 6. TSM employees used the "ssspr.com" domain. Dkt. 54-1 at ¶ 7. The

*Dora L. Bonner v. Triple-S Management Corporation and Triple-S Vida Inc.,* Civil No. 19-1228 (BJM)   10

following email addresses are not valid TSM addresses: (1) f.zelaya@asi-sss.net; (2) albert.gspencer@asi-sss.net; and (3) r.ruiz@asi-sss.net. *Id.*; Dkt. 54-6 at ¶ 6. These were the email addresses used by Zelaya, Gamboa, and the person claiming to be Ruiz. *See* Dkt. 17-1. On January 5, 2016, TSM filed a complaint against Who is Privacy Protection Services, Inc. and Nathan Stringer, the then-owner of the @asi-sss.net domain name, in the World Intellectual Property Organization ("WIPO") Arbitration and Mediation Center. Dkt. 54-8. TSM requested that the @asi-sss.net domain be transferred to TSM because the domain name evoked TSM's "Triple-S" name as well as TSV subsidiary Atlantic Southern Insurance; TSM also claimed that the domain name had been registered and was being used in bad faith. *Id.* An arbitrator determined that the respondents "intentionally registered and used the Disputed Domain Name to create confusion regarding the source of sponsorship, affiliation, or endorsement of the website linked to the Disputed Domain Name, and to use the goodwill and reputation generated by the Complainant to carry out fraudulent transactions." Dkt. 54-9. Accordingly, the arbitrator ordered that the disputed domain name (asi-sss.net) be transferred to TSM. *Id*.

## DISCUSSION

There is no genuine dispute as to any material fact presented above. It is clear that an injustice has happened and that Bonner has suffered as a result. However, it is not clear that Triple-S was involved in perpetrating this injustice. The story that Triple-S tells is almost entirely consistent with the story that Bonner tells. The only arguable source of significant disagreement is not a factual one, or at least it is not over facts that have been established in the record. Rather, it is that Bonner is convinced that the individuals she talked to were who they said they were – that is, that the individuals worked for Triple-S or otherwise had some connection with Triple-S. Triple-S denies this. Unfortunately for Bonner, she offers no evidence to suggest that Triple-S was

involved in defrauding her beyond the statements of the individuals that she spoke to over the phone and via email as well as documents sent to her by the individuals. Triple-S, on the other hand, offers several affidavits to the effect that these statements and documents were fallacious and that the individuals were not actually associated with Triple-S. In doing so, Triple-S has not disputed the facts averred by Bonner, but rather shown that it is impossible that the individuals who spoke with Bonner told the truth about their relationship with Triple-S. The burden has therefore shifted back to Bonner to place at least one material fact into dispute. Unfortunately for Bonner, she has failed to do so.

Moreover, the statements of the individuals that Bonner spoke to over the phone are inadmissible hearsay, as are the signatures that Bonner claims belong to Ruiz and others. "Evidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." *Vazquez v. Lopez-Rosario*, 134 F.3d 28, 33 (1st Cir. 1998). Hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. § 801. Bonner has offered the statements of the individuals as proof that they were who they said they were, or (put another way) that she was in contact with Triple-S. When an otherwise inadmissible hearsay statement is made by a party-opponent, it could potentially be admitted as an opposing party's statement; however, in order to qualify, the party moving for inclusion of the otherwise inadmissible statement must establish that it was made by the party (or the party's agent, employee, coconspirator, or an individual authorized to do so by the party) or that the party manifested that it adopted or believed the statement. Fed. R. Evid. § 801(d)(2).

Bonner has not established that any of the statements were actually made or adopted by Triple-S employees or associates, and the statements do not fall under any hearsay exceptions; as

a result, they are hearsay. *See Hansen v. PT Bank Negara Indonesia (Persero)*, 706 F.3d 1244, 1249 (10th Cir. 2013) (confirming the district court's ruling granting summary judgment to the defendants and holding that phone conversations between the plaintiff and two individuals claiming to be agents of the defendants were inadmissible hearsay). Bonner could authenticate the telephone conversations if she had "evidence that a call was made to the number assigned at the time to: (A) a particular person, if circumstances, including self-identification, show that the person answering was the one called; or (B) a particular business, if the call was made to a business and the call related to business reasonably transacted over the telephone." Fed. R. Evid. § 901(b)(6). However, Bonner has no evidence that the numbers she called were actually assigned to Triple-S or to any of Triple-S's employees or associates. Similarly, Bonner could offer her opinion about Ruiz's voice if the opinion was "based on hearing the voice at any time under circumstances that connect it with the alleged speaker." Fed. R. Evid. § 901(b)(5). However, Bonner has not alleged that she has ever heard Ruiz's voice other than during the phone conversations that gave rise to the present matter. Ruiz's purported signature is also unauthenticated, as are the other signatures; a nonexpert's opinion that handwriting is genuine must be based on a familiarity with it that was not acquired for the current litigation. Fed. R. Evid. § 901(b)(2). Bonner has not claimed that she ever saw Ruiz's handwriting except within the evidence she offers in support of her case. Regardless, Bonner has also failed to allege that any such hearsay exceptions would apply to the statements. As a result, I find that the statements are hearsay.

The emails and other documents sent to Bonner by the individuals she spoke with are also inadmissible hearsay. The emails and other documents do not fall clearly under any hearsay exception, and Bonner does not offer any theory as to why they would be admissible. Records of a regularly conducted activity may be excepted from hearsay, but only if the record was made at

or near the time by someone with knowledge; the record was kept in the course of a regularly conducted activity of a business; making the record was a regular practice of that activity; all of these conditions are shown by the testimony of the custodian or another qualified witness; and the opponent does not show that the source of information indicates a lack of trustworthiness. Fed. R. Evid. § 803(6). Bonner has not claimed that the materials in question are records of a regularly conducted activity, she has not shown that any of the materials in question were kept as part of a regular practice, she has not identified anyone who could testify as to the existence of the conditions that she must establish, and Triple-S has shown that the sources of the emails and other documents are at least potentially untrustworthy. Other theories appear to provide at least equally improbable grounds for admission, and Bonner does not allege any other theories for admissibility anyway. Since Bonner has raised no theory as to why the emails and other documents are admissible and since the materials do not fall clearly under any hearsay exception, I find that they are inadmissible hearsay.

Bonner has raised fraud, breach of contract, breach of fiduciary duty, and RICO claims. However, all four of Bonner's claims are destined to fail for the same reason: that no reasonable factfinder or jury could find that the individuals who defrauded Bonner were associated with Triple-S. Each of these claims relies on some form of association between the accuser and the accused; fraud would require Bonner to detrimentally rely on a false statement by Triple-S, breach of contract would require a valid contract between Bonner and Triple-S, a breach of fiduciary duty would require the existence of a duty on the part of Triple-S towards Bonner, and a RICO violation would require Triple-S to engage in some form of conduct that constituted racketeering activity and involved Bonner. The evidence and the narrative provided by Bonner are not sufficient to establish such associations.

*Dora L. Bonner v. Triple-S Management Corporation and Triple-S Vida Inc.,* Civil No. 19-1228 (BJM)   14

Although I take no position regarding the credibility of the evidence and testimony offered by Triple-S and Bonner, I do find that Triple-S has sufficiently shown that the parties do not disagree as to any material fact, while Bonner has failed to establish that Triple-S disagrees with her as to any material fact; I also find that the majority of the evidence Bonner cites in support of her case is not only insufficient to implicate Triple-S, but also hearsay. *See Burgos Martinez v. City of Worcester*, 502 F. Supp. 3d 606, 618 (D. Mass. 2020) ("It is not the Court's role to evaluate the credibility of witness testimony, but I must evaluate the strength of the evidence which supports that testimony to determine whether there is enough support for the Plaintiff's claims to proceed to trial"). Since there is no genuine dispute as to any material fact in this case and since the material facts lead to the conclusion that Triple-S did not engage in illicit interactions with Bonner, Triple-S is entitled to judgment as a matter of law.

Again, Bonner apparently has been victimized by unscrupulous criminals. However, though Bonner has my sympathy, Triple-S has sufficiently established that Triple-S is nothing more than an uninvolved entity that was impersonated by the real offenders in this matter. Accordingly, I grant summary judgment in favor of Triple-S, and Bonner's suit against Triple-S is dismissed.

## CONCLUSION

For the foregoing reasons, Triple-S's motion for summary judgment is **GRANTED** and Bonner's suit against Triple-S is dismissed with prejudice.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 17th day of December 2021.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge